IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| GAIL S. JONES, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:12cv909 (REP) |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Gail Jones is 57 years old and previously worked as a cook. Plaintiff filed for Disability Insurance Benefits ("DIB") alleging disability due to hearing loss, back pain with lumbago, knee pain with crepitus and foot pain with plantar fasciitis with an amended alleged onset date of January 2, 2007. The Administrative Law Judge ("ALJ") denied her application. On appeal, this Court remanded the case, instructing the ALJ to obtain testimony from a vocational expert ("VE"). Upon rehearing, the ALJ again denied Plaintiff's application for benefits.

This matter is again before the Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment. Plaintiff challenges the ALJ's jurisdiction and the time taken to decide her case. Plaintiff also challenges whether the ALJ based his determinations on substantial evidence.

Plaintiff filed this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final decision to deny her application for DIB. For the reasons discussed below, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED;

that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges whether the ALJ retained jurisdiction to decide her case, the amount of time taken by the ALJ to decide her case, whether the ALJ erred in determining that Plaintiff's lumbago and knee pain with crepitus were non-severe, whether the ALJ failed to correctly assess Plaintiff's credibility and whether the ALJ erred in assigning less than controlling weight to the medical opinions of Plaintiff's treating physicians. Therefore, Plaintiff's educational and work histories, Plaintiff's relevant medical history, Plaintiff's non-treating state agency physician opinion, Plaintiff's reported activities of daily living and Plaintiff's hearing testimony are summarized below.

### A.      Plaintiff's Education and Work History

Plaintiff completed high school and attended nine months of higher education in business studies.  (R. at 24.)  Plaintiff previously worked as a hotel night auditor and as a food service worker.  (R. at 27.)  Plaintiff testified that working became increasingly difficult as the pain in her feet worsened and as her hearing loss interfered with her ability to communicate on the job. (R. at 27-28.)  Plaintiff stopped working in September of 2003 and has not worked since. (R. at 94, 404.)

### B.      Plaintiff's Medical Records

#### 1.      Plaintiff's Foot Pain, Knee Pain and Plantar Fasciitis

On January 24, 2002, Arthur Buckner, M.D., interpreted an x-ray of Plaintiff's left foot as showing a normal foot.  (R. at 328-29.)  Dr. Buckner made no diagnosis despite Plaintiff experiencing "severe pain."  (R. at 328-29.)

2

On January 29, 2003, Plaintiff reported experiencing severe pain in her feet, and Jose
Colina, M.D., referred her to a podiatrist. (R. at 244.) On March 10, 2003, podiatrist Allan Wax,
D.P.M., noted that Plaintiff suffered bursitis of the foot, but the condition needed further testing.
(R. at 165-66.) On March 20, 2003, Plaintiff attended a follow-up appointment with Dr.Wax,
who offered no definitive diagnosis. (R. at 164.) On April 18, 2003, Plaintiff returned to Dr.
Colina complaining of pain in both feet. (R. at 240.)

On May 16, 2003, rheumatologist Sujatha Vuyyuru, M.D., evaluated Plaintiff's bone
scan results, which demonstrated a normal left foot and a right foot with "possible arthritic
changes." (R. at 217-20.) Dr. Vuyyuru indicated that obesity could be contributing to Plaintiff's
foot pain and opined that Plaintiff could reduce her pain by losing some weight. (R. at 219.)

On March 16, 2007, Plaintiffs sought treatment from Dr. Stephen Boychuck, P.C.M., for
severe pain in her left foot, and Dr. Boychuck diagnosed Plaintiff with plantar fasciitis.[1]
(R. at 280-82, 363-66.) Plaintiff received a heel protector on March 21, 2007. (R. at 279, 362.)
On April 4, 2007, Dr. Buckner noted that an x-ray of Plaintiff's feet revealed "no evidence of
fracture, dislocation, heel spur, or other gross abnormalities." (R. at 268, 370.) During
Plaintiff's May 3, 2007 appointment with Dr. Colina, Plaintiff continued to complain of foot
pain. (R. at 273-75.)

On July 28, 2008, Plaintiff visited Dr. Boychuck complaining of knee pain and foot pain.
(R. at 325-27.) On September 4, 2008, Plaintiff returned to Dr. Wax, who administered a
therapeutic injection and noted that Plaintiff's pain occurred mostly in her right foot. (R. at 313.)
An ultrasound revealed plantar fasciitis in Plaintiff's right foot. (R. at 314.) On October 2, 2008,

---

[1]      Plantar fasciitis is deep tissue inflammation within the soles of the feet caused by the
repetitive stretching and tearing of muscle tissue near the heel. *Dorland's Illustrated Medical
Dictionary*, 684 (32d ed. 2010) [hereafter *Doland's*].

Plaintiff received another therapeutic injection, and Dr. Wax noted that, although Plaintiff's conditioned improved, she still experienced some soreness. (R. at 312.)

On October 30, 2008, Dr. Wax noted that Plaintiff's heel pain was gone, but she experienced fatigue in her feet. (R. at 311.) On October 31, 2008, Plaintiff visited Dr. Boychuck's office where she was diagnosed with crepitus[2] within the patellar tendon. (R. at 315-19.) She received a prescription for a knee brace. (R. at 315-19.) Dr. Buckner indicated that Plaintiff's x-ray revealed "[v]ery mild, question significant, degenerative changes" to her right knee. (R. at 372.) After Plaintiff's date last insured, Plaintiff continued to experience pain, injuries, and medical problems with her right knee, including a torn lateral meniscus, effusion, and crepitus. (R. at 548-56.)

> 2.      Plaintiff's Pelvic Pain and Lower Back Pain

On February 24, 2003, Plaintiff underwent a "nonobstetric" ultrasound of her pelvic area after a "recent episode of abnormal vaginal bleeding." (R. at 190-91.) On March 21, 2003, Plaintiff had a follow-up appointment with Kathryn Costello, N.P., who noted that Plaintiff's pain persisted. (R. at 241.) On May 2, 2003, Plaintiff still experienced lower abdominal pain. (R. at 239.) During Plaintiff's February 16, 2005 visit, Nurse Costello noted that Plaintiff experienced no abdominal pain. (R. at 221-22.)

On August 14, 2006, Plaintiff visited Dr. Boychuck's office where Plaintiff received three pain medication prescriptions. (R. at 207-08.) Dr. Boychuck noted that Plaintiff had no history of lower back sprains, lumbar disc degenerations or herniated invertebral discs. (R. at 207-08.) On September 11, 2006, Plaintiff saw Dr. Boychuck, complaining of lower back pain. (R. at 201-03, 296-98.) Dr. Boychuck prescribed pain medication for Plaintiff and noted

---

2       Joint crepitus, is "the grating sensation caused by the rubbing together of the dry synovial surfaces of joints." *Dorland's*, at 684.

that Plaintiff's back pain improved, but Plaintiff experienced pelvic-area pain that radiated to her lower back. (R. at 202, 297.) During a follow-up appointment on September 25, 2006, Dr. Boychuck noted that Plaintiff's back pain improved, but her abdominal pain persisted. (R. at 293-94.)

On July 13, 2007, Vicki-Marie Colacicco of Dr. Boychuck's office noted that Plaintiff experienced lumbago,[3] and Dr. Buckner noted that an x-ray of Plaintiff's back revealed a "normal lumbosacral spine" with "no evidence of traumatic, neoplastic, or significant arthritic change." (R. at 348-49, 370-71.) On December 20, 2007, Plaintiff received counseling from Rebecca Moon of Dr. Boychuck's office, concerning Plaintiff's pelvic pain and pressure. (R. at 331-36.)

### 3. Plaintiff's Hearing Loss

On August 9, 2006, Dr. Colina referred Plaintiff to an ear, nose and throat specialist regarding her hearing loss. (R. at 210-11.) On September 12, 2006, Julie Redmon, M.D., indicated that Plaintiff complained of experiencing ringing in her ears for twenty years, that Plaintiff's hearing grew worse over the past year and that cochlear implants would be considered if she failed a hearing test. (R. at 251-52.) On September 20, 2006, Bridgette Fowler, M.Ed., CCC-A, an audiologist in Dr. Redmon's office, consulted with Plaintiff about her hearing test and gave her materials to "start [the] disability process." (R. at 248.) Plaintiff visited Dr. Redmon's office several times in October and November of 2006 and discussed her feelings that it would be too difficult to return to work, the possibility of cochlear implants and the process of applying for disability benefits. (R. at 248-50.) In a letter to the Social Security Administration dated November 15, 2006, Dr. Redmon and Audiologist Fowler opined that "[d]ue to the

---

[3]       Lumbago is "a non-medical term for any pain in the lower back." *Dorland's,* at 684.

severity and configuration of [Plaintiff's] hearing loss, hearing aids are unable to restore her to a normal or even near normal level." (R. at 247.)

On June 26, [2007],[4] Audiologist Fowler opined that:

Currently, [Plaintiff] has moderate to severe/profound sloping sensorineural hearing loss in both ears. Even with sophisticated hearing aids, it is very difficult for her to communicate normally in routine listening situations whether they are for employment or enjoyment purposes. Unfortunately, her hearing cannot improve and may worsen to the point where a cochlear implant is her only option for hearing.

(R. at 301.) On November 8, 2007, Dr. Redmon completed a Social Security Administration Questionnaire confirming Audiologist Fowler's opinion and further noting that Plaintiff "[w]ould not do well in any environment with background noise [or] noise exposure[,] or where [she] needs acute hearing for safety reasons [or] to receive instructions." (R. at 304-07.) On January 14, 2008, Audiologist Fowler noted that she spoke with Dr. Redmon and sent Plaintiff a letter "denying further clarification [or] detail into her [hearing loss] and not working." (R. at 590.)

C.     Plaintiff's Activities of Daily Living

On November 14, 2006, Plaintiff completed a pain questionnaire in which she noted that she experienced pain in both feet since 2001 when she worked as cook on concrete floors. (R. at 116-18.) Plaintiff described the pain as an aching, stabbing, throbbing and cramping, and she noted that it caused numbness and stiffness throughout the whole foot, top and bottom. (R. at 116.) The pain occurred every day for two hours or more until she got off of her feet. (R. at 116.) Staying off of her feet, taking nonprescription pain medication and applying hot foot baths and deep heat rubs relieved the pain. (R. at 117.)

---

[4]     Audiologist Bridgette Fowler's letter is dated June 26, 2006. (R. at 301.) The stated year appears to be a typographical mistake considering both that Plaintiff was not referred to an ear, nose and throat specialist until August 9, 2006, (R. at 210-11), and that Plaintiff's first visit with Dr. Redmon and audiologist Fowler appears to have occurred on September 12, 2006. (R. at 251-52).

On November 14, 2006, Plaintiff also completed a function report in which she indicated that she lived in a house with her family. (R. at 118.) She normally spent her days cooking, cleaning, exercising, making jewelry and talking with family and friends. (R. at 118, 125.) She played computer games twice a week, read twice a week, went to church once a week, went shopping once a week and helped with yard work when needed. (R. at 125.) She took small breaks during these activities, spoke only with those who were aware of her hearing loss and limited the time she spent on her feet. (R. at 118, 125.) She would cook bigger meals with more sides if she was not suffering from her physical conditions. (R. at 119-20.) She shopped for groceries for up to an hour every two weeks, and she sometimes shopped for other things in stores for thirty minutes and online for ten to twenty minutes. (R. at 121.)

Everyday activities caused Plaintiff pain and, therefore, she tried to stay off of her feet. (R. at 122.) She used hearing aids throughout the day and needed glasses when reading or writing. (R. at 123.) She noted that her condition affected her ability to lift, squat, bend, stand, reach, walk, kneel, talk, hear, climb stairs, complete tasks and follow instructions. (R. at 124.) Insofar as these activities required her to use her feet, she experienced pain, and insofar as they required hearing, she had trouble communicating. (R. at 124.) She could follow written instructions well, but spoken instructions poorly. (R. at 124.) She experienced no difficulty sitting, seeing, concentrating, understanding, using her hands or getting along well with others. (R. at 121.)

Plaintiff experienced no difficulty dressing, bathing or otherwise caring for herself. (R. at 120.) She went outside two to three times a day and could go places alone by walking and driving. (R. at 121.) She could walk up to one-half of a mile before resting. (R. at 121.) She

7

could pay bills, count money, use a checkbook and handle a savings account, and her conditions had no effect on her ability to handle money. (R. at 121.)

On June 6, 2007, Plaintiff completed another function report, indicating essentially the same activities with certain exceptions. (R. at 141-48.) She experienced difficulty dressing and bathing because of the pain in her feet. (R. at 142.) She experienced worsening pain in her feet and louder tinnitus in her ears, which prevented her from sleeping adequately and thus affected her ability to concentrate. (R. at 142, 146, 148.) She walked less and made quicker meals. (R. at 143.) Plaintiff noted that she went to the store, to church and to social activities less frequently than before her conditions developed, but she did not specify whether the frequency decreased from her November 14 function report. (R. at 145-48.) Plaintiff noted in her second function report that her conditions did not affect her ability to reach, kneel, complete tasks or follow instructions, but that her condition affected her ability to understand. (R. at 146.)

D.     Non-Treating State Physician's Report

On January 9, 2007, David Williams, M.D., completed a physical Residual Functional Capacity ("RFC") assessment. (R. at 259-65.) Dr. Williams noted that Plaintiff's primary diagnosis was sensorineural hearing loss and that her secondary diagnosis was bursitis of the foot.[5] (R. at 259.)

Concerning Plaintiff's hearing loss, Dr. Williams opined that Plaintiff was limited in hearing, unlimited in speech and should avoid even moderate exposure to noise. (R. at 262.) Concerning Plaintiff's foot pain, Dr. Williams found that Plaintiff could stand and/or walk for about six hours in an eight-hour work day and sit for about six hours in an eight-hour workday. (R. at 260.) Plaintiff had an unlimited capacity for pushing, pulling, and operating hand and foot

---

[5]     Bursitis is inflammation of the fluid sac that prevents friction between the bones of a joint. *Dorland's*, at 264.

controls. (R. at 260.) Dr. Williams further opined that Plaintiff could frequently lift up to twenty-five pounds and occasionally lift up to fifty pounds. (R. at 260.) According to Dr. Williams, Plaintiff experienced no postural, manipulative, visual or environmental limitations. (R. at 261-62.) Dr. Williams also noted that his opinions were not significantly different from the findings of Plaintiff's treating physicians. (R. at 263.)

      E.     Plaintiff's Testimony

On January 16, 2009, Plaintiff appeared at a hearing in Richmond before the ALJ. (R. at 18-20.) Plaintiff testified that she lived in Prince George, Virginia, with her husband. (R. at 23.) Her foot pain and hearing loss prevented her from working since 2006. (R. at 27-28.) She used hearing aids, which worked "okay" in the context of the hearing before the ALJ, but she heard only background noise whenever she went out. (R. at 28.) She indicated that her hearing loss had no possibility of improving and that her home telephone was equipped with a loud ringer and flasher to alert her to calls. (R. at 38.)

Plaintiff took prescription medication and received injections for her foot pain. (R. at 29-30, 36-38.) She could stand for periods of ten minutes before sitting. (R. at 29-30, 36-38.) Plaintiff's back pain caused her difficulty sitting, which she could do for periods of about forty minutes before she needed to stand. (R. at 30-31.) She sometimes took medication for her back pain. (R. at 30-31.) Plaintiff could walk "a few blocks" at a time and did not require the assistance of a wheelchair, walker, crutch, cane, brace or splint. (R. at 31.) Plaintiff also took medication for knee pain, but she had not undergone any surgeries or injections for her knee. (R. at 31.) Her pain regularly affected her ability to sleep. (R. at 32.)

Plaintiff could cook, clean and launder the clothes of her household, but she divided the laundry into small loads and folded it while seated. (R. at 32-33, 36.) She engaged in her hobby

of jewelry making about twice a week. (R. at 34, 37.) She could no longer perform yard work, and she stopped going to church or visiting friends. (R. at 34, 37.)

After her case was remanded to the ALJ for VE testimony, Plaintiff testified before the ALJ during a supplemental hearing in Richmond on September 14, 2011. (R. at 401.) She still lived in Prince George with her husband and she had not resumed working. (R. at 403-04.) Plaintiff did not testify about her medical conditions during the supplemental hearing. (R. at 401-05.)

## II. PROCEDURAL HISTORY

On October 17, 2006, Plaintiff filed her application for DIB and alleged an onset date of September 10, 2003. (R. at 9, 81-83.) Her claim was initially denied on January 10, 2006. (R. at 9, 50.) Plaintiff requested reconsideration on March 2, 2007, and the Appeals Council denied her request on June 13, 2007. (R. at 9, 55, 57.) On January 16, 2009, Plaintiff appeared with counsel for a hearing before the ALJ. (R. at 9, 453.) During the hearing, Plaintiff amended her alleged onset date to September 26, 2006. (R. at 9, 21.) On March 4, 2009, the ALJ denied her request for benefits. (R. at 9, 17, 434.) On May 20, 2010, the Social Security Appeals Council denied Plaintiff's request for review of the ALJ's decision. (R. at 1-3, 384.)

On July 19, 2010, Plaintiff appealed to this Court. *Jones v. Astrue*, Case No. 3:10cv490-JRS, ECF No. 1 (E.D. Va. 2010). The Government agreed that the ALJ should obtain testimony from a VE, and the district court reversed and remanded Plaintiff's case on November 15, 2010. (R. at 384, 440-43.) On March 16, 2011, the Appeals Council accordingly vacated the ALJ's decision and remanded Plaintiff's case for VE testimony. (R. at 384, 448-49.) Before her supplemental hearing, Plaintiff amended the alleged onset date of her hearing loss to January 2, 2007, and argued that her hearing loss qualified as a severe impairment under a revised

Listing 2.10 promulgated on that date.  (R. at 384, 526-29 (citing 20 C.F.R., pt. 404, Subpt. P,

App. 1, § 2.10).)  On September 14, 2011, Plaintiff appeared with counsel at a supplemental

hearing where the ALJ obtained testimony from a VE.  (R. at 384, 401-02, 405-17.)  In

September 10, 2013, after hearing the VE's testimony and receiving medical opinion testimony

on the newly promulgated Listing 2.10, the ALJ again denied Plaintiff's request for benefits.

(R. at 387-88, 391-93, 619-22.)  Plaintiff filed this action for judicial review of the

Commissioner's decision.

## III.  QUESTIONS PRESENTED

1. Did the ALJ lack jurisdiction to decide this case?

2. Does substantial evidence support the ALJ's determination that Plaintiff's lumbago and right knee pain with crepitus were non-severe?

3. Does substantial evidence support the ALJ's determination regarding Plaintiff's credibility?

4. Does substantial evidence support the ALJ's decision to afford Plaintiff's treating physicians' opinions less than controlling weight?

5. Should the case have been taken away from the ALJ based upon "undue delay?"

## IV.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether the Commissioner's decision was supported by substantial evidence in the

record and whether the proper legal standards were applied in evaluating the evidence.  *Hancock*

*v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance and is the

kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion.

*Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Hancock*, 667 F.3d at 472 (citation and internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the Commissioner's determination is not supported by substantial evidence on the record or if the Commissioner has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[6]  20 C.F.R. §§ 416.920(b), 404.1520(b).  If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition.  *Id.*  If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c).  To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment, and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d).  If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[7] based on an assessment of the claimant's RFC[8] and the "physical and mental demands of work [the claimant]

---

[6]    SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities.  Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a).  Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).  Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[7]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[8]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that his limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.*

## V. ANALYSIS

A.    The ALJ's Decision

Plaintiff appeared before the ALJ for hearings in Richmond on January 16, 2009, and September 14, 2011. (R. at 20, 401.) After the first hearing, the ALJ rendered his decision in a written opinion dated March 4, 2009, and determined that, based on Plaintiff's application for DIB filed on October 17, 2006, Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act. (R. at 17.)

The ALJ held a supplementary hearing after this Court reversed and remanded the case to obtain evidence from a VE. (R. at 401, 440.) An impartial VE testified during the second hearing. (R. at 405-17.) The ALJ rendered his second decision in a written opinion dated September 10, 2012, and again determined that, based on the same application for DIB, Plaintiff was not disabled from the amended alleged onset date to Plaintiff's date last insured. (R. at 381, 393.)

The ALJ followed the five-step sequential evaluation established by the Social Security Act in analyzing whether Plaintiff was disabled. (R. at 385.) First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date of January 2, 2007. (R. at 386.) Second, the ALJ determined that Plaintiff suffered severe impairments in the form of sensorial hearing loss, bilateral foot bursitis and plantar fasciitis, but found that Plaintiff's lumbago and right knee pain with crepitus were not severe. (R. at 386-87.) Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. at 387); 20 C.F.R. §§ 404.1520(d), 404.1525-1526, 404.920(d), 416.925-926.

15

At step four, the ALJ determined that Plaintiff maintained the ability to perform light work except that she could not perform jobs that require above-average hearing, expose her to greater than moderate background noise or require contact with the general public. (R. at 388.) In reaching this conclusion, the ALJ followed a two-step analysis of whether the medically determinable physical symptoms could reasonably be expected to produce Plaintiff's pain and subjective symptoms, and the extent to which those symptoms limited Plaintiff's functioning. (R. at 388.) The ALJ concluded that, based on the evidence, Plaintiff's impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms lacked credibility. (R. at 389.) At step five of the analysis, the ALJ concluded that, based on the VE's testimony and Plaintiff's age, education and work experience, a significant number of jobs existed in the national economy that Plaintiff could perform. (R. at 391-92.)

Plaintiff moves for summary judgment on a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks to have her case reversed and remanded for additional administrative proceedings. (Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 10) at 18.) Plaintiff challenges the ALJ's decision on the basis that the ALJ lacked jurisdiction to decide the case. (Pl.'s Mem. at 9.) Plaintiff also contests the validity of the ALJ's decision based on a theory of undue delay. (Pl.'s Mem. at 10.) Further, Plaintiff argues that the ALJ erred in finding some of Plaintiff's impairments non-severe, assessing Plaintiff's credibility and assigning less than controlling weight to Plaintiff's treating physicians' opinions. (Pl.'s Mem. at 11, 13, 17.)

B.     The ALJ had jurisdiction to hear the case.

Plaintiff contends that the ALJ lacked jurisdiction to decide the case, because the ALJ, who presided over Plaintiff's initial and supplementary hearings, lost jurisdiction to decide her case when he moved from the Richmond hearing office ("HO") to the Charlottesville HO before deciding Plaintiff's case. (Pl.'s Mem. at 9-10.) Defendant maintains that the ALJ retained jurisdiction over the matter. (Def.'s Mot. Summ. J. Mem. Supp. ("Def.'s Mem.") (ECF No. 11) at 21.)

Specifically, Plaintiff argues that when the ALJ moved to the Charlottesville office, he lost jurisdiction to rule on Plaintiff's case pursuant to section I-2-0-70 of the Act's Hearings, Appeals and Litigation Law Manual ("HALLEX"), which reads in pertinent part:

> Each hearing office (HO) has jurisdiction over a designated geographic area referred to as the HO's "service area." The HO will generally process all requests for hearing (RHs) for claimants residing in that area. In general, hearings will be held within 75 miles of the claimant's home.
>
> . . .
>
> When an HO receives a RH, the HO staff will screen the RH to determine if the HO has jurisdiction, i.e., whether the claimant's address is in the geographic area the HO serves. If the HO does not have jurisdiction, the HO staff will forward the RH to the HO that does.

HALLEX I-2-0-70(A)-(B).

However, HALLEX also provides that "[t]he ALJ who schedules the hearing for the party who first filed the RH will have jurisdiction over the case." HALLEX I-2-1-45(E)(4). Plaintiff's initial and supplemental hearing were both scheduled by the same ALJ who decided her case. (R. at 17, 20, 68-71, 393, 401, 485-89.) Both hearings were held in Richmond, (R. at 20, 401), which Plaintiff concedes is the proper location for the service area in which she resided at the time. (Pl.'s Mem. at 9). Accordingly, the ALJ retained jurisdiction over the matter

when he moved to Charlottesville pursuant to a HALLEX I-2-1-45(E)(4) and, therefore, did not err in deciding Plaintiff's case.

      C.      Substantial evidence supports the ALJ's determination that Plaintiff's lumbago and right knee pain with crepitus were non-severe.

Plaintiff argues that the ALJ erred in determining that Plaintiff's lumbago and knee pain with crepitus were non-severe, causing her "no physical limitations." (Pl.'s Mem. at 12.) Defendant argues that substantial evidence supports the ALJ's determination. (Def's Mot. 24.)

The second step of an ALJ's analysis requires a claimant to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment under the Act, the impairment must cause more than a minimal effect on her ability to function. 20 C.F.R. § 404.1520(c). An impairment is not severe if it "has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1982).

As a preliminary matter, Plaintiff misreads the ALJ's opinion. The ALJ did not determine that Plaintiff's lumbago and right knee joint pain with crepitus caused her "no physical limitations," (Pl.'s Mem. at 12), but rather that they had at most a "minimal effect on [Plaintiff's] ability to function [and were] therefore, 'not severe,'" (R. at 387). Therefore, the ALJ applied the correct standard in determining that Plaintiff's lumbago and knee pain were non-severe impairments. Further, substantial evidence supports the ALJ's finding on the basis that the medical evidence provides no indication that these impairments had more than a minimal effect on Plaintiff's ability to function.

Regarding Plaintiff's lumbago, during Plaintiff's August 14, 2006 doctor's visit for back pain, no history of lower back sprains, lumbar disc degeneration or herniated invertebral discs existed. (R. at 207-08.) During Plaintiff's September 11, 2006 visit to Dr. Boychuck, Plaintiff's back pain improved. (R. at 202, 297.) Plaintiff's July 2007 x-ray revealed "no evidence of traumatic, neoplastic, or significant arthritic change" in Plaintiff's spine. (R. at 370-71.)

Substantial evidence also supports the ALJ's determination that Plaintiff's right knee pain with crepitus is not severe. (R. at 386-87.) Plaintiff was diagnosed with crepitus within the patellar tendon of her right knee on October 31, 2008. (R. at 316-17.) In October 2008, x-ray results of Plaintiff's right knee demonstrated "very mild marginal degenerative" changes. (R. at 372.) Moreover, Plaintiff testified at her initial hearing before the ALJ that she sought neither surgeries nor injections for her knee pain at that time. (R. at 31-32, 464-65.)

In Plaintiff's pain questionnaire completed on November 14, 2006, Plaintiff only complained of pain in her feet and did not mention that she experienced any pain in her knees or back. (R. at 16-117.) She normally spent her days cooking, cleaning, exercising, making jewelry and talking with family and friends. (R. at 118, 125.) She shopped for groceries for up to an hour every two weeks, and she sometimes shopped for other things in stores for thirty minutes. (R. at 121.) Plaintiff experienced no difficulty dressing, bathing, or otherwise caring for herself and she could walk up to one-half of a mile before resting. (R. at 120-21.) Plaintiff noted in her second function report that her conditions did not affect her ability to kneel. (R. at 146.) Therefore, substantial evidence supported the ALJ's determination that Plaintiff's lumbago and right knee pain with crepitus were non-severe.

D.     Substantial evidence supports the ALJ's assessment of Plaintiff's credibility.

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility relating to her pain

and hearing loss, because the determination lacks the support of substantial evidence and the

ALJ impermissibly relied solely upon Plaintiff's activities of daily living when making the

determination. (Pl.'s Mem. at 13-16.) Defendant contends that substantial evidence supports the

ALJ's determination. (Def.'s Mem. at 25.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant

can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20

C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must

follow a two-step analysis. *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-

7p; 20 C.F.R. §§ 404.1529(a), 416.929(a).  The first step is to determine whether there is an

underlying medically determinable physical or mental impairment or impairments that

reasonably could produce the individual's pain or other related symptoms. *Craig,* 76 F.3d at

594; SSR 96-7p, at 1-3.  The ALJ must consider all of the medical evidence in the record. *Craig*,

76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically stating that the

"RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis

added).  If the underlying impairment reasonably could be expected to produce the individual's

pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements

about the intensity and persistence of the pain and the extent to which it affects the individual's

ability to work. *Craig,* 76 F.3d at 595.  The ALJ's evaluation must take into account "all the

available evidence," including a credibility finding of the claimant's statements regarding the

20

extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff is disabled. *See Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's statements concerning "the intensity, persistence and limiting effects" of her hearing loss symptoms and pain were "not credible." (R. at 389.) In making this determination, the ALJ considered Plaintiff's testimony, her written statements and medical records, and the non-treating state physician's opinions. (R. at 388-91.) Accordingly, contrary to Plaintiff's argument, the ALJ did

not rely solely on Plaintiff's activities of daily living or her ability to communicate at the hearings in making these determinations; therefore, the ALJ applied the correct legal standard.

Further, substantial evidence supports the ALJ's determination that Plaintiff's statements about her subjective pain were not fully credible. Though Plaintiff reported pain, she cooked, cleaned, shopped, exercised and performed light yard work. (R. at 118-26, 141-48.) Plaintiff experienced no difficulty dressing, bathing, or otherwise caring for herself and she could walk up to one-half of a mile before resting. (R. at 120-21.) Plaintiff did not require the assistance of a wheelchair, walker, crutch, cane, brace or splint. (R. at 31.) She shopped for groceries for up to an hour every two weeks, and she sometimes shopped for other things in stores for thirty minutes. (R. at 121.)

The non-treating State physician opined that Plaintiff could stand and/or walk for about six hours in an eight-hour work day and sit for about six hours in an eight-hour workday. (R. at 260.) Plaintiff had an unlimited capacity for pushing, pulling, and operating hand and foot controls. (R. at 260.)

Substantial evidence also supports the ALJ's determination that Plaintiff's statements about her hearing loss were not fully credible. Plaintiff effectively communicated by listening and speaking during her hearings. (R. at 21-39, 401-04.) Plaintiff could go places alone by driving and walking. (R. at 118-26, 141-48). She experienced no difficulty concentrating, understanding or getting along well with others. (R. at 121.) Therefore, substantial evidence supports the ALJ's determinations regarding Plaintiff's credibility.

E.   Substantial evidence supports the ALJ's decision to afford less than controlling weight to Plaintiff's treating physicians' opinions.

Plaintiff argues that the ALJ erred in affording less than controlling weight to the opinions of Plaintiff's treating physicians, Dr. Wax and Dr. Redmon. (Pl.'s Mem. at 13.)

22

Defendant argues that substantial evidence supports the ALJ's determinations. (Def.'s Mem. 27.)

When the ALJ determines whether the claimant has a medically determinable severe impairment or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's provided medical records and any medical evidence resulting from consultative examinations or medical expert evaluations. *See* 20 C.F.R. § 416.912(f). When the record contains a number of medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners and other sources, and when they are consistent, then the ALJ makes determinations based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent with each other or with other evidence, then the ALJ must evaluate the opinions and assign them differing weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require the ALJ to accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e).

Dr. Wax opined that Plaintiff could sit and stand for only five-minute intervals before needing to change positions and that Plaintiff could stand and walk for no more than two hours.

(R. at 377-80.) The ALJ assigned the opinion limited weight, because objective medical evidence failed to support it. (R. at 390.)

Substantial evidence supports the ALJ's determination to afford less than controlling weight to Dr. Wax's opinion. Dr. Wax indicated that Plaintiff's condition needed further testing. (R. at 165-66.) On March 20, 2003, Dr. Wax offered no definitive diagnosis. (R. at 164.) On October 30, 2008, Dr. Wax noted that Plaintiff's heel pain was gone. (R. at 311.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff attended church and went out alone by driving. (R. at 121.) Plaintiff admitted that her daily living activities included cooking, cleaning, exercising and helping with yard work when needed. (R. at 118, 125.) Plaintiff also admitted that she could attend church and go shopping without the assistance of another person or assistive device. (R. at 31, 119-25.) The non-treating state physician further opined that Plaintiff, with normal breaks, could stand and walk for a combination of about six hours out of an eight-hour workday. (R. at 260.) Moreover, the non-treating state physician opined that Plaintiff, with normal breaks, could sit for about six hours out of an eight-hour workday. (R. at 260.)

Regarding Dr. Redmon's opinion, Dr. Redmon opined that Plaintiff would have difficulty working or understanding spoken communication in a setting with background noise. (R. at 304-07.) The ALJ assigned some, but not controlling weight to the opinions of Dr. Redmon concerning Plaintiff's hearing loss on the basis of Plaintiff's admitted activities of daily living. (R. at 390.)

Substantial evidence supports the ALJ's decision concerning the weight afforded to Dr. Redmon's opinion. Plaintiff effectively communicated by listening and speaking during her hearings. (R. at 21-39, 401-04.) Plaintiff attended church and went places alone by driving and

walking. (R. at 118-26, 141-48.) She went shopping for groceries. (R. at 121.) Accordingly, substantial evidence supports the ALJ's decisions to afford less than controlling weight to the opinions of Dr. Wax and Dr. Redmon.

      F.     Undue delay is not grounds for reversal in this case.

Plaintiff contends that her case should have been "taken away from ALJ Swank for undue delay despite Congressional inquiry" and "transferred to [a] new ALJ." (Pl.'s Mem. at 10.) Defendant argues no undue delay existed. (Def.'s Mem. 22.)

HALLEX provides that a case requiring special processing may be designated as a "critical case" to ensure "prompt action on the case." HALLEX I-4-3-43(A). A case warrants "critical case" designation when, *inter alia*, the case has been "delayed an inordinate amount of time, *and* there is a public, congressional, or other high priority inquiry on the case." HALLEX I-4-3-43(B)(6).

Plaintiff argues that her claim took "more than 60 days longer than the average processing time," because 361 days elapsed between Plaintiff's supplementary hearing and the issuance of the ALJ's opinion. (Pl.'s Mem. at 10.) Further, Representative Bobby Scott wrote twice on Plaintiff's behalf to inquire into the status of her application for DIB. (Pl.'s Mem. at 10.)

While congressional inquiry existed, Plaintiff failed to demonstrate that the case was delayed for unreasonable period of time. Plaintiff cites to *Loving v. Astrue*, 2012 WL 4329277, at *1 (E.D. Va. Sept. 20, 2012), *rev'd in part* 2012 WL 4329283, for the proposition that nine months is "'an unusually long delay for the issuance of an [ALJ's] opinion'" after a hearing for DBI or SSI. (Pl.'s Reply (ECF No. 12) at 1.) However, Plaintiff's reliance on *Loving* is misplaced. Ultimately, in *Loving*, the ALJ's decision was reversed and remanded, not for any delay in rendering a decision, but for the ALJ's failure to support his determinations with

substantial evidence. 2012 WL 4329283 at *10. Here, substantial evidence supports the ALJ's decision and no separate issue requiring remand exists.

Moreover, there is no statutory deadline for processing a claim for DIB. *Heckler v. Day*, 467 U.S. 104, 113 (1984). In *Day*, the Court indicated that "Congress repeatedly has been made aware of the long delays associated with resolutions of disputed disability claims and repeatedly has considered and expressly rejected suggestions that mandatory deadlines be imposed to cure that problem." *Id.* at 114. Instead, the Court recognized that the time needed to issue a decision varies on a case-by-case basis. *Id.* at 115. In applying this standard, courts have held that multiple-month delays are not remarkable in the Social Security system and do not constitute error. *See Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989) (finding that a six-month delay for developing the record or a total of 19 months from the claim's initiation to the completion of the ALJ's review does not create undue delay); *see also Littlefield v. Heckler*, 824 F.2d 242, 247 (3d Cir. 1987) (no error took place when a nine-month delay occurred between the ALJ's opinion and the final decision of the Appeals Council).

The time between Plaintiff's supplementary hearing on September 14, 2011, and the ALJ's decision on September 10, 2012, included a ten-month period in which the ALJ sought to evaluate Plaintiff's supplemental hearing arguments by obtaining medical opinion evidence via interrogatories to determine whether Plaintiff's hearing loss in fact met the requirements of the newly promulgated Listing 2.10. (R. at 541-42, 609-11, 626-28.) Accordingly, Plaintiff's complaint of undue delay lacks merit.

## VI.    CONCLUSION

For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 9) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: January 23, 2014

27